UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RICHARD J. CONNOLLY,

                              Plaintiff,

      v.                                                1:11:-cv-0164

JOSEPH F. CALVANESE and
ROBERT COLEMAN,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiff Richard J. Connolly commenced the instant action pursuant to 42 U.S.C. § 1983 alleging claims of false arrest, malicious prosecution, and the use of excessive force in connection with his arrest and prosecution. Presently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complain in its entirety. Plaintiff opposes the motion.

**I.**     **FACTS**

On August 7, 2008, Plaintiff was at a friend's house for dinner. Sometime thereafter, Plaintiff left his friends house and proceeded to drive on the New York State Thruway. Plaintiff entered the Thruway at Exit 21 at approximately 11:40 p.m. At approximately 11:45 p.m., the toll collector radioed the Thruway dispatcher and reported that a northbound red Subaru bearing license plate DVT7533 was being operated in an erratic manner and identified the situation as a possible "1192" or driving while intoxicated ("DWI").

Plaintiff ultimately ended up on the Thruway heading south. Plaintiff pulled into the southbound New Baltimore Service Area parking lot so he could use the restroom and get a cup of coffee. Unsure whether the service area was open, Plaintiff remained in his car with the motor running to see whether anyone came out of the building. Plaintiff remained in his vehicle for approximately thirty minutes.

      Defendant New York State Trooper Joseph Calvanese heard the radio transmission concerning the red Subaru. At 11:57 p.m., Calvanese responded that he had located the red Subaru at the New Baltimore Service Area.[1] Calvanese noted that Plaintiff was not in a parking space, but was positioned over the parking lines in the parking lot with the engine running. Calvanese asked Plaintiff if he knew why he had been pulled over, to which Plaintiff replied, "[y]ou didn't; I've been sitting her about a half an hour now." Calvanese responded that Plaintiff smelled like alcohol and inquired whether Plaintiff had been drinking. Calvanese further claims that he observed Plaintiff's eyes to be glassy and his speech slurred. Plaintiff admitted to drinking one beer at approximately 5:00 or 6:00 p.m.

      Calvanese directed Plaintiff to exit the vehicle. Plaintiff responded that he had a brain injury, was partially paralyzed on one side, and, among other things, could not walk.[2] Due to Plaintiff's injuries, he was unable to perform various standard field sobriety tests. Calvanese did have Plaintiff touch his right thumb to the fingers on his right hand while

---

[1] Calvanese claims that he suspected that Plaintiff made an illegal u-turn on the Thruway because the toll collector reported the vehicle as proceeding northbound, but Calvenese located Plaintiff at the southbound New Baltimore Service Area.

[2] Plaintiff suffers from various ailments as a result of having sustained two gunshot wounds to his head during nighttime live ammunition practice at Fort Drum while on army reserve duty. Plaintiff suffered a traumatic brain injury. His injuries include left side paralysis, memory loss, language difficulties, depression, post-traumatic stress disorder, and vision problems.

indicating which digit he was touching and recite the alphabet. The parties dispute whether Plaintiff passed these tests. Calvanese also asked Plaintiff to blow into a small hand held device. Plaintiff complied to the best of his ability. Plaintiff claims that the device registered a blood alcohol content of 0.0%. Calvanese, on the other hand, states that, based on the device's design, the person taking the test cannot see the results. While Plaintiff was blowing into the machine, Calvanese cursed at Plaintiff, asked whether Plaintiff was "a fucking retard," and placed Plaintiff under arrest.

Calvanese handcuffed Plaintiff's right wrist only and placed Plaintiff in the back of the police car. Calvanese read Plaintiff his *Miranda* rights. Calvanese also requested that Plaintiff submit to a breathalyzer test. Defendants contend that Plaintiff refused to take a breathalyzer test. Plaintiff denies that he refused to take such a test anytime while at the rest area or while in the police car.

Calvanese arrived with Plaintiff at the Troop T station at approximately 1:00 a.m. The parties dispute the next series of events. According to Plaintiff, he was taken directly to the area in the station where fingerprinting is done.[3] Defendant New York State Trooper Robert Coleman fingerprinted Plaintiff's right hand and then attempted to fingerprint his left hand. To fingerprint Plaintiff's left hand, Coleman grabbed around the fingers of Plaintiff's left hand and yanked his hand out straight toward the paper and ink, trying to get Plaintiff to open his fingers. In the process of doing so, Coleman pulled Plaintiff's left arm out of the socket. Plaintiff complained to the sergeant that "they started to hurt me, pull my arm out."

---

[3] Defendants contend that they never fingerprint an individual before the individual has either refused to submit to a breathalyzer test or tested positive after consenting to the test.

Defendants contend that this is not possible because the fingerprint card is secured on the very outside of a waist-high counter, the suspect stands at the ink plate with his elbow flexed at approximately 90 degrees, and someone extending their arm out would reach beyond the ink plate.  Defendants further maintain that Coleman offered to not fingerprint Plaintiff's left hand or to do the best they could and that Plaintiff agreed to fingerprint his left hand.

According to Plaintiff, his fingers ultimately did extend out and Coleman fingerprinted the fingers on Plaintiff's left hand all at the same time.  Defendants argue that the fingerprint card demonstrates that Plaintiff's left hand was never fingerprinted all at once.  Coleman did not successfully fingerprint Plaintiff's left hand.

Plaintiff asserts that Defendants then proceeded to put certain information into the breathalyzer machine in anticipation of conducting a breathalyzer test.  Defendants claim to have asked Plaintiff twice whether he would submit to the test.  According to Plaintiff, he refused to take the test after Defendants injured him during the course of fingerprinting.[4]

Defendants then drove Plaintiff to the New Baltimore Town Court for arraignment.  After arraignment, Plaintiff was taken to the Greene County Correctional Facility.  Plaintiff was not placed in a cell, but was permitted to wait for his girlfriend in the visiting room.

On August 8, Plaintiff's girlfriend arrived and picked him up from the Greene County Correctional Facility.  Within a week or two thereafter, and before going to see a doctor, Plaintiff reduced his left should dislocation by himself.  Shortly thereafter, Plaintiff went to his doctor at the V.A.  Plaintiff complained of shoulder pain for the prior one to two weeks, which had worsened in the immediately preceding four days.  An x-ray was read as "possible mild

---

[4] Again, Defendants claim that Plaintiff was asked to submit to a breathalyzer before being fingerprinted.

degenerative osteoarthritis in the left shoulder." No other abnormality was noted. Plaintiff was diagnosed with "probable exacerbation" of his adhesive capsulitis. Motrin was ordered as needed with hydrocodone for severe pain.

On September 1, 2008, Plaintiff was treated at the V.A. emergency room for worsening left arm pain. Plaintiff was given a shot and told to call his primary care provider the following day. Plaintiff did not follow up with any treatment for the remainder of 2008.

The charges against Plaintiff ultimately were dismissed. Plaintiff them commenced the instant action asserting claims of false arrest, malicious prosecution, and the excessive use of force. Presently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

## II.     STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56. It is well settled that, on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing

summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

With these standards in mind, the Court will address the pending motion.

### III.     DISCUSSION

#### a.     False Arrest/Malicious Prosecution

##### 1.     Trooper Coleman

Defendants moves to dismiss the false arrest and malicious prosecution claims against Coleman on the ground that he was not personally involved in Plaintiff's arrest or prosecution. Plaintiff's concede that Coleman was not involved. Accordingly, the false arrest and malicious prosecution claims are dismissed as to Coleman.

##### 2.     Trooper Calvanese

Defendants also move to dismiss the false arrest and malicious prosecution claims against Calvanese on the ground that he acted with probable cause, or arguable probable cause. Defendants contend that the radio transmission from the toll collector claiming to have spotted a red Subaru driving erratically together with Calvenese's claimed observations (Plaintiff's vehicle was parked across the lines; Plaintiff smelled of alcohol, had slurred speech, an unsteady gait and bloodshot eyes; and Plaintiff failed the finger count and

alphabet tests)[5] gave him probable cause or, at least, arguable probable cause to believe that Plaintiff was driving under the influence of alcohol.  Defendants also note that Plaintiff was reported by the toll collector to be proceeding northbound, but was found shortly thereafter at the southbound rest area, thereby suggesting that Plaintiff had made an illegal u-turn on the highway.   Plaintiff counters that triable issues of fact remain because he successfully passed the alphabet test, the Alco-sensor produced a reading of 0.0%, and Plaintiff stated he drank only one beer.

Probable cause exists when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Posr v. Court Officer Shield No. 207, 180 F.3d 409, 414 (2d Cir. 1999).  "A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." Hahn v. County of Otsego, 820 F. Supp. 54, 55 (N.D.N.Y. 1993), aff'd, 52 F.3d 310 (2d Cir. 1995).  Arguable probable cause exists if (1) it was objectively reasonable for the officer to believe there was probable cause to make the arrest, or (2) reasonably competent

---

[5] In their statement of material facts, Defendant Calvanese states that "in addition to the smell of alcohol, plaintiff's eyes were glassy and his speech was slurred. . . ." Defs.' Stmnt. of Mat. Facts at ¶ 38.  In response, Plaintiff denies this fact and, in support of the denial, points to paragraph 37 of his affidavit, which states:

> The charge . . . brought against your deponent was untrue and both charges were filed out of malice based on the Defendants' perception that your deponent was not cooperating when, in fact, you deponent's disability was preventing him from performing field sobriety tests.

This response does not properly address Defendants' statement that Plaintiff smelled of alcohol, his eyes were glassy, and his speech was slurred.  Accordingly, these facts are deemed admitted. See N.D.N.Y.L.R. 7.1(a)(3).

police officers could disagree as to whether there was probable cause to arrest. Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997).

Here, Defendants were not able to conduct the standard sobriety tests due to Plaintiff's disabilities. The toll collector's observations of erratic driving could reasonably be found to have been corroborated by a potentially illegal u-turn (which, in and of itself, would give rise to probable cause to arrest, see Atwater v. Lago Vista, 532 U.S. 318, 354, 121 S. Ct. 1536 (2001)), the manner in which Plaintiff's car was parked, and the observations of Plaintiff's eyes, speech, and the smell of alcohol. Even assuming Plaintiff passed the finger and alphabet tests, these above-listed facts, together with Plaintiff's admission that he had consumed alcohol, are enough to establish arguable probable cause. Scully v. City of Watertown, 2005 WL 1244838, at *9 n.11 (N.D.N.Y. 2005) (and cases cited therein).[6] These same factors provide sufficient arguable probable cause for Plaintiff's prosecution on charges of driving while intoxicated. Accordingly, the false arrest and malicious prosecution claims must be dismissed.

    **b.    Excessive Force**

Plaintiff next contends that he was subjected to the excessive use of force during the fingerprinting process. Plaintiff claims that during the attempts to fingerprint his left hand, Defendant Coleman grabbed around the fingers of Plaintiff's left hand and yanked on his fingers until his shoulder came out of the socket. Plaintiff claims that Coleman then proceeded to fingerprint his left hand simultaneously on one spot of the fingerprint card.

---

[6] Plaintiff reported to his treating physician that "his tiredness and disabilities were misinterpreted as intoxication," thereby substantiating the objective reasonableness of Calvanese's actions.

Defendants respond that Plaintiff's version of the fingerprinting card is directly refuted by the fingerprint card and there is no medical evidence substantiating the claim that Plaintiff's shoulder was dislocated during the fingerprinting process or that he was otherwise subjected to an unreasonable amount of force.

"[A]ll claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." Graham v. Connor, 490 U.S. 386, 394 (1989).  Defendants' motive or intent is irrelevant. Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004).  Determining whether the force used was excessive requires an assessment of the facts and circumstances of the case, including the severity of the crime, whether the suspect poses a safety threat, and whether he is resisting arrest or attempting to evade arrest.  Calamia v. City of New York, 879 F.2d 1025, 1034-35 (2d Cir. 1989).

Here, there is no indication that Plaintiff had engaged in a crime of violence, posed a safety threat, was resisting arrest, or otherwise attempted to evade arrest.  Other than an apparent refusal to take a breathalyzer test, it appears that Plaintiff was otherwise cooperative.  Thus, the ordinary circumstances in which force is typically used are not present here.  Nonetheless, considering the totality of the evidence, and looking at the evidence in the light most favorable to Plaintiff, the Court finds that there is insufficient evidence from which a fair minded trier of fact could reasonably conclude that Plaintiff was subjected to the excessive use of force.

"Although a showing of excessive force does not require proof of permanent injury, . . . [t]he absence of any injury . . . is [a] compelling [indication that excessive force was not

used]." Jennejahn v. Village of Avon, 575 F. Supp.2d 473, 480-81 (W.D.N.Y. 2008); see also Wysner v. Dallas County Sheriff's Dept., 1997 WL 10030, at *4 (N.D. Tx. 1997).  For the following reasons, the Court finds that Plaintiff has failed to demonstrate a triable issue of fact on whether excessive force was used.

First, the physical evidence (i.e. the fingerprint card) demonstrates that the fingers and thumb of Plaintiff's left hand were printed individually, thereby directly refuting his contention that Coleman grabbed the fingers of his left hand and fingerprinted the whole hand simultaneously.  See Scott v. Harris, 550 U.S. 372 (2007) (on a summary judgment motion, a court need not adopt a version of events clearly contradicted by the record evidence).  The print of each of Plaintiff's left hand fingers is placed within the applicable box on the fingerprint card and at the same height.  Taking into account the fact that Plaintiff's fingers are not all the same length, it would have been impossible for Coleman to print the left hand all at once.  Further, that portion of the fingerprint card where Plaintiff's four fingers would ordinarily be printed together was left blank.  In that space, it was written that Defendants were unable to fingerprint the left hand fingers due to Plaintiff's disability.[7]  The fact that the print card shows individual prints of four fingers and a thumb from Plaintiff's left hand (and no print of a whole hand) directly contradicts his claim that Coleman printed the whole hand at once and possibly a few fingers thereafter.  Pl. Dep. at 147; Scott, 550 U.S. 372.

---

[7] Defendants claim that, due to Plaintiff's disability, they offered not to print his hand "or . . . [to] do the best we can" and that Plaintiff agreed to do the best they could.  Coleman Aff. at ¶ 17. This is consistent with the fact that Defendants did not handcuff Plaintiff's left wrist due to his disability.

Second, there is no indication that, after the fingerprinting incident, Plaintiff complained of shoulder plain to Defendants, the Sergeant at the station,[8] the judge at arraignment, anyone at the Greene County Correctional Facility, or to his girlfriend when she picked him up from the Greene County Correctional Facility.  Similarly, there is no evidence that he requested medical attention at any time while in custody.

Third, Plaintiff did not seek medical attention for over two weeks, thereby suggesting that any pain caused to his left shoulder during the fingerprinting process was *de minimis*.  Plaintiff, who does not appear to have any medical training, claims to have self-reduced his dislocated shoulder within a week or two.[9]

Fourth, although Plaintiff complained of increased shoulder pain when he visited the doctor on August 25, 2008, the objective medical evidence does not substantiate that his shoulder had been dislocated.  Prior to the subject incident, Plaintiff had a history of left shoulder pain, including adhesive capsulitis[10] of the left shoulder.  At the August 25, 2008

---

[8] In his affidavit, Plaintiff does claim to have stated "loudly to the sergeant, 'Hey Sergeant your men just hurt me.'" There is no indication, however, that Plaintiff further complained of pain or requested medical attention.

[9] At deposition, Plaintiff was asked the following questions and gave the following answers:

Q:   And how was it –

A:   Put back in?

Q:   – put back in?  Yes.

A:   I put it back in.

Q:   How did you do it?

A.   Tried to push it like this (indicating), when I went on the rowing machine I got.. . .

[10] The Court takes judicial notice of the definition of adhesive capsulitis, also known as frozen shoulder.  This is "a shoulder affected by severe pain, stiffness, and restricted motion."

(continued...)

medical appointment, Plaintiff was diagnosed with "probable excerbation [sic]" of adhesive capsulitis in the left shoulder. An x-ray taken on August 25, 2008 revealed "slight irregularity in the articular margin of the glenoid process of scapula suggesting mild degenerative osteoarthritis. . . There is no fracture or other bony abnormality." The impression was of "[p]ossible mild degenerative osteoarthritis in the left shoulder." There is no medical evidence in the record suggesting that any exacerbation of Plaintiff's adhesive capsulitis was caused, or could be caused, by the manner in which he is alleged to have been fingerprinted. On September 1, 2008, Plaintiff was treated at the V.A. emergency room for worsening left arm pain. Plaintiff was given a shot and advised to contact his primary care provider's nurse the following day. Plaintiff did not do so. Plaintiff also did not follow up with a scheduled orthopedic consult. Moreover, none of the medical records make any reference to the subject incident, thereby suggesting that Plaintiff never claimed to his medical providers that his shoulder pain was related to his arrest.

Based on the foregoing, the Court finds that there is insufficient evidence from which it reasonably can be concluded that Defendants used excessive force in fingerprinting Plaintiff or, in the alternative, that Defendants are entitled to qualified immunity concerning the amount of force used to obtain Plaintiff's fingerprints.

---

[10](...continued)
http://www.merriam-webster.com/medlineplus/frozen+shoulder; see also
http://www.thefreedictionary.com/adhesive+capsulitis;
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001490/;
http://www.mayoclinic.com/health/frozen-shoulder/DS00416 (all websites accessed on June 4, 2012)

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and Plaintiff's Complaint is DISMISSED IN ITS ENTIRETY.

IT IS SO ORDERED.

Dated: June 7, 2012

_____
Thomas J. McAvoy
Senior, U.S. District Judge